# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA
* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>FRANK CHAVEZ,<br><br>　　　　Defendant. | Case No. 2:15-cr-00035-RFB-CWH<br><br>**ORDER ON MOTION TO SUPPRESS** |

## I.　　INTRODUCTION

Before this Court for consideration is Defendant Frank Chavez's Motion to Suppress, ECF No. 23. In his Motion, Chavez argues that any evidence or statements obtained from him by law enforcement during the night of January 16, 2015 and morning of January 17, 2015 should be suppressed. Chavez asserts that the evidence and statements were obtained wrongfully due to Las Vegas Metropolitan Police Department officers and detectives unlawfully entering his residence, unlawfully detaining and interrogating him, and searching his bedroom pursuant to a warrant supported by material misrepresentations. For the reasons stated below, the Court grants the Motion in part and denies it in part.

## II.　　PROCEDURAL HISTORY

On February 3, 2015, Frank Chavez was charged in a one-count Indictment with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g) and 924(a). ECF No. 1. On March 27, 2015, Chavez filed a Motion to Suppress based on unlawful searches, an unlawful detention, and unlawfully obtained statements, seeking to suppress the evidence and statements that were obtained from him on the night of his arrest on January 16-17, 2015. On April 21,

2015, the Court held an evidentiary hearing on the Motion and received testimonial and documentary evidence. This Opinion and Order follows that hearing and explains the Court's reasoning for granting the Motion in part and denying it in part.

### III. FINDINGS OF FACT

The Court makes the following findings of fact based upon the testimony and documents provided at the evidentiary hearing. These findings of fact are further based upon the Court's assessment of the credibility of the witnesses who testified at the hearing as well as an assessment of the other evidence presented at the hearing. As the Court explained prior to the close of the hearing, for its decision, the Court does not consider any other evidence that may have been attached to motions but was not presented at the hearing.

#### A. Entry Into the Residence

At approximately 10:03 p.m. on January 16, 2015, Sandra Rentfro placed a call to the Las Vegas Metropolitan Police Department ("Metro"). Government's Ex. 1 ("CAD Rep."). Rentfro's call was assigned to Metro Officers Christina Alfonsi and James O'Leary at 10:51 p.m. Tr. of Suppression Hrg. 13:1-2, ECF No. 39 ("Tr."). At the time they were assigned the call, Alfonsi and O'Leary were informed that Rentfro reported a domestic disturbance involving a disagreement between herself and Chavez, who was her son's roommate, and that Chavez possessed a firearm but that the location of the firearm was unknown at the time of the call. Id. at 14:1-10, 86:18-21; CAD Rep. The call was reported by Metro dispatch as a domestic disturbance. Tr. at 86:23-25. The address given was 2836 Palm Springs Way in Las Vegas. CAD Rep.

Alfonsi and O'Leary arrived at the address given at 11:05 p.m. Id. at 13:2. Rentfro was inside the residence and came outside to speak with Alfonsi when the officers arrived. Id. at 17:8-24, 88:6-24. While Rentfro and Alfonsi were speaking, O'Leary was standing several feet away. Id. at 88:16-21. Rentfro told Alfonsi that she was visiting her son, who owned the house, and that she had come from out of town. Id. at 17:19-20. Rentfro also informed Alfonsi that her money was missing and that she believed Chavez had taken it. Id. at 17:11-13. While Alfonsi

1  testified that her conversation with Rentfro outside the residence took approximately five to eight
2  minutes, the Court finds that the duration of this conversation was actually somewhat shorter.
3  Considering O'Leary's testimony and the information that was conveyed to Alfonsi before entry,
4  the Court finds that the conversation lasted approximately two to four minutes.  Rentfro then
5  invited Alfonsi into the residence, and O'Leary followed them inside. Id. at 18:1-4, 89:1-3.

6        Once inside the residence, Alfonsi continued to speak with Rentfro in the entryway. Id.
7  at 18:17-19.  O'Leary asked Rentfro where Chavez was. Id. at 89:6.  Rentfro indicated that
8  Chavez was in the living room, and O'Leary immediately went there. Id. at 89:5-16.  As
9  O'Leary went to the living room, Raymond Fletcher, Rentfro's son and the owner of the
10 residence, came into the entryway and also began to speak with Alfonsi. Id. at 18:17-22, 22:10.
11 Importantly, the Court finds that Fletcher engaged Alfonsi as O'Leary was entering the living
12 room and prior to O'Leary's search of Chavez.  The Court further finds that, because of the
13 proximity of the entryway to the living room, Fletcher would have seen O'Leary entering the
14 living room and also would have heard O'Leary's increasingly louder commands to Chavez to
15 wake up and stand up. (Just as Alfonsi heard the problems O'Leary had with Chavez which led
16 her to go into the living room to assist O'Leary in his patdown of Chavez.)  Fletcher did not
17 object to the officers' presence inside his home. Id. at 19:1-4.  He never indicated that his
18 mother was an unwelcome guest or questioned in any way the fact that his mother had invited
19 the officers into his home.  The Court also finds that, despite having an opportunity to do so
20 before Chavez was searched, Fletcher did not object to O'Leary's entry into the living room or
21 O'Leary's commands to Chavez prior to the patdown search.  The Court also finds that Fletcher
22 participated in discussions with Alfonsi in her investigation of the alleged disturbance prior to
23 Chavez being searched.  During this conversation and prior to Chavez being searched, Fletcher
24 did not object to the officers' presence in his home, did not object to his mother's invitation to
25 them and did not object to O'Leary going into the living room to look for and question Chavez.

26     **B.  Patdown Search of Chavez**

27       O'Leary entered the living room, which was dimly lit, and saw Chavez sleeping on the
28 couch.  Hrg. Tr. at 89:16-24, 90:1-4.  The room was not a bedroom and it was not locked.  The

1  entryway and living room were separated by a kitchen, but there were no doors dividing these
2  areas of the residence, so light from the entryway spilled into the living room and there was
3  visibility into the living room from the entryway. Id. at 89:16-24, 24:2-7. The couch where
4  Chavez was sleeping was approximately twelve to fifteen feet away from Alfonsi, who was
5  speaking with Rentfro and Fletcher in the entryway. Id. at 64:4-25, 65:1-10. Portions of the
6  inside of the living room could be seen from the entryway. Id. at 24:2-9. O'Leary identified
7  himself as a Metro officer and asked Chavez to stand up and speak with him. Id. at 90:10-15.
8  O'Leary did this three times with increasing volume. Id. Chavez, who appeared to have been
9  asleep, stood up after the third request by O'Leary and did not say anything as he stood up. Id.

10  O'Leary asked Chavez if he was carrying any firearms or anything illegal, to which
11  Chavez responded no. Id. at 90:23-25, 91:1-2. O'Leary then asked for, and Chavez granted,
12  permission to pat Chavez down for weapons.[1] Id. O'Leary had Chavez spread his feet apart and
13  place his hands behind his back. Id. at 91:3-6. O'Leary grabbed Chavez's hands while he
14  conducted the patdown search. Id. at 96:22-23. As O'Leary began to pat down the back of
15  Chavez's waistband, Chavez pulled his hands away from O'Leary's grip, put his hands in front
16  of his body, and began to hunch forward. Id. at 96:24-25, 97:1-4, 97:17-19. At that point,
17  O'Leary drew his firearm and told Chavez to put his hands where O'Leary could see them. Id. at
18  97:25, 98:1-4. Alfonsi then entered the living room to assist O'Leary. Id. at 25:16-20. Based on
19  the testimony and the proximity of the entryway to the living room, the Court finds that Alfonsi
20  was able to hear O'Leary's commands to Chavez from where she was standing in the entryway
21  speaking to Fletcher and Rentfro. The two officers placed Chavez in handcuffs, at which point
22  O'Leary completed the patdown search. Id. at 25:20-24, 26:1-4.

23  While patting down Chavez's right rear pocket, O'Leary felt the shape of what he
24  immediately believed to be a firearm. Id. at 102:17-22. O'Leary reached into the pocket and

---

[1] At the hearing, there was disagreement over the specific wording of the question asked by O'Leary when asking for permission to pat Chavez down and whether Chavez's answer constituted consent. Based upon the totality of O'Leary's testimony, the Court finds that O'Leary could reasonably conclude from Chavez's words that Chavez consented to the patdown search. This is corroborated by Chavez's subsequent actions, which were consistent with a finding that he consented.

1 recovered a firearm. Id. at 14-20. He then brought Chavez, still in handcuffs, outside and
2 instructed him to stand in front of Alfonsi's patrol car. Id. at 104:12-17. O'Leary attempted to
3 enter the serial number of the firearm recovered from Chavez into the Metro database, but could
4 not initially locate the serial number on the firearm. Id. at 104:19-21, 105:8-9. He then
5 discovered the faint outline of numbers on the back of the handle of the firearm that appeared to
6 have been mostly scratched off or obliterated. Id. at 105:9-13. Upon discovering that the serial
7 number on the firearm recovered from Chavez appeared to have been obliterated, O'Leary
8 contacted Metro's firearms unit. Id. at 105:19-25. The firearms unit entered Chavez's name into
9 its system and informed O'Leary that Chavez had previously been convicted of a felony. Id. at
10 106:1-7.

**C. Chavez's First Statement to Alfonsi and O'Leary**

12 After discovering that the firearm recovered from Chavez had an obliterated serial
13 number, Alfonsi asked Chavez if he would be willing to speak with her, to which he responded
14 yes. Id. at 29:25, 30:1-2. At the point when he agreed to speak with Alfonsi, Chavez was
15 handcuffed and in the back of Alfonsi's patrol car. Id. at 30:1-2, 107:1-19, 109:18-24. Chavez
16 denied that he possessed Rentfro's money or prescription medication and told Alfonsi and
17 O'Leary that he did not know what they were talking about. Id. at 30:5-8. One of the officers
18 then asked Chavez where he obtained the firearm. Id. at 30:10-12. Chavez answered that he had
19 found the gun a few days before, that he had it for protection, and that he thought it was a BB
20 gun. Id. at 30:12-13, 109:24-25, 110:1-3. O'Leary relayed this information to firearms
21 detectives when they arrived on the scene. Id. at 110:4-6.

22 As she was putting Chavez in the patrol vehicle, Alfonsi conducted a search of Chavez's
23 person. Id. at 110:21-22. During the search, Alfonsi recovered an unknown amount of money
24 from Chavez's waistband. Id. at 110:22-25. O'Leary asked Chavez who the money belonged to,
25 and Chavez initially responded that the money belonged to him. Id. at 111:1-2. O'Leary then
26 informed Chavez that Rentfro did not want to press charges against Chavez. Id. at 111:10-12.
27 At that point, Chavez told O'Leary that the money belonged to Rentfro and he wished to give it
28 back to her. Id. at 111:12-14. Although Alfonsi testified that she read Miranda rights to Chavez,

1 the Court does not have any evidence before it of the rights, if any, that Alfonsi actually read to
2 Chavez. This is of particular significance because the defense specifically raised in its briefs the
3 issue of whether the actual questions, if any, that were asked of Chavez were the appropriate
4 ones under Miranda v. Arizona, 384 U.S. 436 (1966).

### D. Chavez's Second Statement to Bien

In response to the call of Alfonsi and O'Leary, Firearms Investigation Unit Detectives Frank Bien and Breck Hodson arrived at the residence and were briefed by O'Leary. Tr. at 208:23-25, 209:1-15. The detectives arrived at approximately 12:30 a.m. on January 17. Id. at 200:17-20. In his briefing, O'Leary informed Bien and Hodson that he and Alfonsi had responded to a domestic disturbance call where one of the subjects was believed to have been armed at the time. Id. at 210:21-22. O'Leary also told the detectives that he and Alfonsi had recovered a firearm from the subject believed to have been armed (Chavez) and that they discovered that he had a previous conviction. Id. at 210:22-25. Id. at 209:13-15, 210:8-12. O'Leary also erroneously informed Hodson and Bien that Chavez was Rentfro's son. Id. at 178:3-16. Finally, O'Leary informed the detectives that Rentfro had discovered shotgun ammunition located inside the room that she had been staying in, which had formerly been occupied by Chavez. Id. at 187:6-13.

After being briefed, Bien proceeded to conduct a custodial interview of Chavez. Id. at 152:6-12. Bien commenced the interview at approximately 1:10 a.m. Id. at 200:16. Before questioning Chavez, Bien advised him of certain rights, which Bien referred to as Miranda rights. Id. at 153:11-15. Bien read the rights from a card issued by Metro, which reads as follows: "Advisement for Custodial Interrogation (Adults). You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to the presence of an attorney during questioning. If you cannot afford an attorney, one will be appointed before questioning. Do you understand these rights?" Government's Ex. 3. After Bien asked Chavez if he understood the rights read to him, Chavez responded "yes, sir." Id. at 165:10-11. Shortly after being read these rights, Chavez stated to Bien that he would "tell him what happened." Id.

///

1  at 164:16-17.  The Court has not been presented with evidence of the statement Chavez gave to
2  Bien during this custodial interrogation.

### E. The Warrant Application

While Bien conducted the interrogation of Chavez, Detective Hodson began preparing a search warrant application.  Id. at 209:25, 210:1-4.  In preparing the warrant application, Hodson utilized the information given him by O'Leary as well as Chavez's conviction history.  Id. at 211:23-25, 212:1-2.

Hodson initiated the telephonic warrant application to Judge Lippis at 1:36 a.m. to search the residence and the body of Frank Chavez.  App. for Telephonic Search Warrant 1-2, Def.'s Ex. A ("Warrant App.").  In the telephonic application, Hodson described the property to be seized as 1) any firearms, including an unknown make and model shotgun; 2) any firearms-related accessories; 3) receipts for firearms, ammunition, and firearms accessories; 4) DNA from the mouth of Chavez; 5) articles of personal property demonstrating the identity of the person(s) in control of the premises, and 6) items showing a possessory interest in the other items sought. Warrant App. at 2-3.  In his statement of probable cause to Judge Lippis, Hodson incorrectly stated that Chavez was Rentfro's son and that Rentfro was in town visiting Chavez at the residence, where Chavez was renting a room from Fletcher.  Id. at 3.  Hodson also stated to Judge Lippis that O'Leary and Alfonsi recovered a black semi-automatic handgun from Chavez pursuant to a patdown search, that they discovered that the serial number on the gun appeared to have been obliterated, and that they contacted the firearms unit to verify if Chavez was a prohibited person.  Id. at 4-5.  Hodson also averred that while Alfonsi and O'Leary were conducting a records check on Chavez, Rentfro "then returned to the room that she was staying in and began to frantically search the room looking for her missing property.  At that time she discovered . . . numerous shotgun shell ammunition [sic]. . . ."  Id. at 5.  Hodson further informed Judge Lippis that as Chavez was taken into custody, he stated "that the firearm, in his possession, was in fact a pellet gun and that . . . the other supposed firearm in his room is also a pellet gun." Id. at 6.  Judge Lippis then authorized the telephonic search warrant.  Id. at 7.

/ / /

After Hodson concluded the call and obtained the search warrant, Bien informed Hodson that, based on his interview of Chavez, he had discovered that Rentfro's son was not Chavez but rather Fletcher, the owner of the residence. Tr. at 214:10-22. Hodson and Bien determined that this information about the true relationship between Chavez, Rentfro, and Fletcher did not affect the determination that probable cause existed for the warrant. Id. at 215:9-25. They also checked with Sergeant Rader, the ranking officer on the scene, who agreed with Hodson and Bien's assessment. Id. at 215:25, 216:1-5. Hodson and Bien then proceeded to execute the search warrant. Id. at 216:6. Neither detective called Judge Lippis back to ask whether this new information would change her probable cause determination. Id. at 247:4-25, 248.

Hodson entered Chavez's bedroom and took photographs of a bag containing 12-gauge shotgun shells that was on the floor. Id. at 216:18-20. The shells were in plain sight. Id. at 216:18-25, 217:1-5. Hodson also photographed several spent .22 caliber shell casings that were found on the floor of the bedroom. Id. at 216:20-23. These casings matched the caliber of the firearm retrieved from Chavez. Id. at 223:1-7.

The handgun found during O'Leary's patdown search of Chavez is the basis for the charge against Chavez in this case.

**IV. DISCUSSION**

**A. Entry Into the Residence and the Living Room**

Based on the facts of the case and the applicable law, the Court finds that the officers had legal authority to enter the residence.

1. Legal Standard

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. Physical entry into the home is "the chief evil against which the wording of the Fourth Amendment is directed . . . ." United States v. U.S. Dist. Court, 407 U.S. 297, 313 (1972); see also Murdock v. Stout, 54 F.3d 1437, 1440 (9th Cir. 1995) ("[T]he protection of individuals from unreasonable government intrusion into their houses remains at

1  the very core of the Fourth Amendment."), abrogated on other grounds by United States v.
2  Ramirez, 523 U.S. 65 (1998).  Therefore, "[t]o safeguard the home," police "normally require a
3  warrant before [they] may enter." Frunz v. City of Tacoma, 468 F.3d 1141, 1142-43 (9th Cir.
4  2006).  "Evidence recovered following an illegal entry of the home is inadmissible and must be
5  suppressed."  United States v. Arreguin, 735 F.3d 1168, 1174 (9th Cir. 2013) (quoting United
6  States v. Shaibu, 920 F.2d 1423, 1425 (9th Cir. 1990)).

7        "[C]onsent is a recognized exception to the Fourth Amendment's protection against
8  unreasonable searches and seizures." United States v. Russell, 664 F.3d 1279, 1281 (9th Cir.
9  2012).  "[T]he government has the burden of establishing the effectiveness of a third party's
10  consent to a search of a defendant's property." Arreguin, 735 F.3d at 1174.  Consent to a search
11  is not lightly inferred.  United States v. Reid, 226 F.3d 1020, 1025 (9th Cir. 2000).  "The
12  government may meet its burden to show consent by demonstrating that: (1) a third party had
13  shared use and joint access to or control over a searched area; or (2) the owner of the property to
14  be searched has expressly authorized a third party to give consent to the search." Arreguin, 735
15  F.3d at 1174-75 (citation omitted) (internal quotation marks omitted).

16        "[I]f the government cannot present proof of a party's actual authority, the government
17  may establish consent by means of the 'apparent authority doctrine.'" Id. at 1174-75 (citation
18  omitted).  "Under the apparent authority doctrine, a search is valid if the government proves that
19  the officers who conducted it reasonably believed that the person from whom they obtained
20  consent had the actual authority to grant that consent." Id. at 1175 (quoting United States v.
21  Welch, 4 F.3d 761, 764 (9th Cir. 1993)).  "Apparent authority is measured by an objective
22  standard of reasonableness, and requires an examination of the actual consent as well as the
23  surrounding circumstances." United States v. Ruiz, 428 F.3d 877, 881 (9th Cir. 2005).  Thus, in
24  assessing whether an officer's belief was objectively reasonable, the court considers "the facts
25  available to the officer at the moment . . . ." Illinois v. Rodriguez, 497 U.S. 177, 188 (1990)
26  (citation omitted).
27  / / /
28  / / /

2. <u>Rentfro Had Apparent Authority to Grant Access to the Residence and Living Room</u>

The Court finds that Rentfro had apparent authority to consent to the officers' entry into the residence and to O'Leary's subsequent entry into the living room. There were several indicia of Rentfro's authority available to officers prior to their search of Chavez. First, Rentfro herself called from the residence, and was present at the residence when officers arrived approximately one hour later. Second, upon the officers' arrival, she came from inside of the home to greet them. Third, she told the officers that her son owned the residence and that she had come to visit him. Fourth, she walked back into the house and invited the officers inside. There was no evidence of forced entry or any evidence that she had to get the assistance of others to gain entry into the house. Fifth, Raymond Fletcher, Rentfro's son and the owner of the residence, came out of his room almost as soon as the officers entered the residence. He did not object to their presence in his home. He did not question or object to his mother having invited the officers into his home. Upon hearing O'Leary give commands to Chavez to stand up, Fletcher did not object even though he had time to do so. All of these factors would give an officer an objectively reasonable belief that Rentfro had apparent authority to allow officers entry into the residence and entry into the living room.

Additionally, the Court finds unpersuasive the defense's argument that Rentfro's authority to allow entry to the house differed from her authority to grant access to the living room. The living room was connected to the entryway area and was not closed off from it in any way. There was no door to the living room. Individuals in the entryway, and the kitchen into which the entryway opened, could see directly into the interior of the living room from both the kitchen and the entryway. The defense's reliance on <u>Arreguin</u>, 735 F.3d at 1175-77, is therefore misplaced. There, the Ninth Circuit held that the fact that a third party answered the front door at 11 a.m. and had a sleepy appearance did not support a reasonable belief that the third party had authority to consent to a search of the master suite, where the officers knew virtually nothing about the third party or his relationship to the various rooms and areas of the residence. <u>Id.</u> In this case, by contrast, the information known to the officers that established Rentfro's apparent

1  authority to allow entry into the house, combined with the fact that the living room was
2  connected to the entryway area and was not closed off, was sufficient for the officers to
3  reasonably "presume, without further inquiry, that [Rentfro] had joint use, access, or control"
4  over the living room.  Id. at 1177.  This was not a situation, like Arreguin or the cases cited
5  therein, where a third party granted access to a closed room or container.  See, e.g., id. at 1176-
6  77; United States v. Davis, 332 F.3d 1163, 1170 (9th Cir. 2003) (third party sharing an apartment
7  with the defendant had no actual or apparent authority to consent to a search of the defendant's
8  gym bag located inside the apartment); United States v. Fultz, 146 F.3d 1102, 1106 (9th Cir.
9  1998) (homeowner had no apparent authority to consent to search of the appellant's boxes that
10 the homeowner allowed to be stored in her home).  Rather, the living room was part of the same
11 open and common living space which comprised the entryway and the kitchen.  Thus, Rentfro's
12 apparent authority to allow access to the entryway also extended to the living room.

13 The Court also rejects the defense's argument that the scope of consent actually given by
14 Rentfro did not extend to O'Leary or to the living room.  Although O'Leary testified that he was
15 not expressly invited inside by Rentfro and that he followed Alfonsi inside after she was invited
16 in, it is clear that Rentfro was aware of O'Leary's presence when she extended the invitation.
17 Neither she nor Fletcher objected to O'Leary's entry into the residence despite having an
18 opportunity to do so.  Further, once O'Leary entered the residence he asked Rentfro where
19 Chavez was, and she responded by telling O'Leary that Chavez was in the living room and
20 pointing in that direction.  Again, although they could have done so, neither Rentfro nor Fletcher
21 objected to O'Leary's entry into the living room.  Based on these facts, the Court finds that
22 Rentfro consented to O'Leary's entry into the residence and the living room.

23 **B.  Search of Chavez**

24 The Court finds that the officers had legal authority to conduct a patdown search of
25 Chavez.

26     1. Legal Standard

27 In Terry v. Ohio, the Supreme Court created a limited exception to the general
28 requirement that officers must have probable cause before conducting a search.  392 U.S. 1, 30

1  (1968). The Court held that officers may conduct an investigatory stop consistent with the
2  Fourth Amendment "where a police officer observes unusual conduct which leads him
3  reasonably to conclude in light of his experience that criminal activity may be afoot . . . ." Id. In
4  addition, an officer may conduct a brief patdown (or frisk) of an individual when the officer
5  reasonably believes that "the persons with whom he is dealing may be armed and presently
6  dangerous . . . ." Id. "[T]he stop and the frisk . . . must be analyzed separately; the
7  reasonableness of each must be independently determined." United States v. Thomas, 863 F.2d
8  622, 628 (9th Cir. 1988). The analysis regarding whether a frisk was constitutional is a dual one
9  that asks (1) "whether the officer's action was justified at its inception," and (2) whether the
10 officer's action was "confined in scope" by engaging in a "carefully limited search of the outer
11 clothing . . . in an attempt to discover weapons which might be used to assault" an officer. Terry,
12 392 U.S. at 19-20, 29-30. The officer must provide "specific and articulable facts" justifying the
13 search that indicate something more than a general "governmental interest in investigating
14 crime . . . ." Id. at 21, 23. Indeed, a patdown search "is not justified by any need to prevent the
15 disappearance or destruction of evidence of crime. The sole justification of the [patdown]
16 search . . . is the protection of the police officer and others nearby . . . ." Id. at 29 (citation
17 omitted). "The officer need not be absolutely certain that the individual is armed; the issue is
18 whether a reasonably prudent man in the circumstances would be warranted in the belief that his
19 safety or that of others was in danger." United States v. $109,179 in U.S. Currency, 228 F.3d
20 1080, 1086 (9th Cir. 2000) (quoting Terry, 392 U.S. at 27).

21                    2. Officers Had Reasonable Suspicion to Detain and Frisk Chavez

22         The Court finds that the officers had reasonable suspicion to detain and frisk Chavez.

23         In terms of the initial stop or detention by O'Leary, it was justified by a few facts.
24 Officers received information that a domestic disturbance had occurred at the particular
25 residence. Prior to arriving at the residence, they also received information that a man named
26 Frank possessed a weapon but that the location of the weapon was unknown at the time of the
27 call. Upon arriving at the residence, the officers were met by the person who had made the call,
28 Rentfro, who informed them that she believed that "Frank" (Chavez) had stolen money from her.

1  After inviting the officers into the residence, she told O'Leary where he could find Chavez.
2  O'Leary found him in the living room where Rentfro had indicated he was located. Thus, the
3  officers received information from a credible known witness who told them directly that she
4  believed that Chavez had stolen her money. This was sufficient to create reasonable suspicion
5  for officers to detain Chavez to investigate the possible theft of Rentfro's money.

6  The officers also had a reasonable belief that Chavez may have been armed and
7  dangerous at the time. They had previously received specific information that he possessed a
8  weapon. They had been informed that Chavez had allegedly stolen money from Rentfro. While
9  the officers did not have information that Chavez had used the weapon to commit the theft, they
10 did know that Rentfro was at least aware of his possession of the weapon. Alfonsi also testified,
11 and the Court credits her testimony, that domestic disturbance calls in her experience represent
12 one of the most dangerous situations that officers encounter. Officer O'Leary also initiated his
13 contact with Chavez almost immediately upon entry into the residence. His initial questions to
14 Chavez focused on Chavez's potential possession of a weapon. This was not a situation in which
15 the officers conducted the frisk only after completing, or nearly completing, their investigation of
16 the incident which was the basis for the detention. O'Leary's first and primary concern was
17 ensuring his safety and that of the others present in the residence.

18 O'Leary's initial frisk of Chavez was also appropriately limited. Chavez conducted an
19 initial patdown of Chavez' outer clothing. Upon feeling a bulge in Chavez' pants pocket that he
20 believed on the basis of his experience to be a handgun, O'Leary then reached into Chavez's
21 pocket to retrieve the weapon. O'Leary's initial search, however, was restricted to patting down
22 the outer clothing of Chavez, and he reached into Chavez's pocket only after feeling the shape of
23 a handgun. Thus, O'Leary's search was properly confined initially and only progressed after he
24 felt the identifiable shape of a handgun.

25 Finally, the defense's argument that O'Leary arrested Chavez without probable cause
26 when he woke Chavez from sleep is unavailing. "There has been an arrest if, under the
27 circumstances, a reasonable person would conclude that he was not free to leave after brief
28 questioning." United States v. Del Vizo, 918 F.2d 821, 824 (9th Cir. 1990). Whether an

- 13 -

investigatory stop has risen to the level of an arrest is determined in light of the totality of the circumstances. Green v. City & Cnty. of San Francisco, 751 F.3d 1039, 1047 (9th Cir. 2014). Here, the Court finds based on the totality of the circumstances that O'Leary's detention of Chavez did not amount to an arrest. O'Leary stood over the couch where Chavez was sleeping, identified himself as a Metro officer, and asked Chavez if he could stand up and talk to O'Leary. O'Leary's search of Chavez occurred at the beginning of his interview of Chavez. O'Leary did not detain Chavez after O'Leary's reasonable suspicion of Chavez had dissipated. On the contrary, O'Leary's detention of Chavez occurred at the height of his suspicion of Chavez. Prior to exploring the details of the alleged theft, O'Leary appropriately sought to secure his safety and the safety of others on the scene. Given the specific circumstances here, O'Leary's conduct was not unreasonable as a method of securing his own safety and the safety of others and of investigating whether Chavez had stolen Rentfro's money.

### C. Chavez's Statements to Alfonsi and O'Leary and to Bien

The Court finds that Chavez's first statement to Alfonsi and O'Leary was obtained in violation of his Miranda rights and must be suppressed, because the government did not meet its burden of showing that proper warnings were given and that Alfonsi obtained a valid waiver of Chavez's rights. The Court further finds that Chavez' second statement to Bien must also be suppressed as the Miranda warnings read to Chavez were legally deficient.

1. Legal Standard

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. In Miranda v. Arizona, the Supreme Court established guidelines for the application of the Fifth Amendment's privilege against self-incrimination to the context of custodial interrogations by law enforcement. 384 U.S. 436, 441-42 (1966). The Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. at 444. The Court defined "custodial interrogation" as any questioning by law enforcement initiated after an individual has been taken into custody or significantly

deprived of the freedom to act. Id. "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id.

While "no talismanic incantation [is] required to satisfy [Miranda's] strictures," California v. Prysock, 453 U.S. 355, 359 (1981) (per curiam), it is also the case that a valid waiver requires not only "that one be warned of his right to counsel *during* questioning," but also that he "be warned of his right to consult with an attorney *before* questioning," People of the Territory of Guam v. Snaer, 758 F.2d 1341, 1342 (9th Cir. 1985) (emphases in original). "[I]t is extremely important that a defendant be adequately warned of this right." Id. In order to comport with the Fifth Amendment, however, the advisement does not have to be explicit as long as it "adequately convey[s] notice of the right to consult with an attorney before questioning." Id.

"For inculpatory statements made by a defendant during custodial interrogation to be admissible in evidence, the defendant's waiver of Miranda rights must be voluntary, knowing, and intelligent." United States v. Garibay, 143 F.3d 534, 536 (9th Cir. 1998) (internal quotation marks omitted). The determination of whether a waiver was valid "depends upon the totality of the circumstances including the background, experience, and conduct of [the] defendant." Id. (internal quotation marks omitted). "There is a presumption against waiver . . . which the Government bears the burden of overcoming by a preponderance of the evidence." United States v. Crews, 502 F.3d 1130, 1139-40 (9th Cir. 2007). The government can satisfy this burden by "prov[ing] that, under the totality of the circumstances, the defendant was aware of the nature of the right being abandoned and the consequences of such abandonment." Id. at 1140. "The government's burden to make such a showing is great, and the court will indulge every reasonable presumption against waiver of fundamental constitutional rights." Garibay, 143 F.3d at 537 (internal quotation marks omitted).

/ / /

/ / /

/ / /

### 2. Neither Alfonsi nor O'Leary Obtained a Valid Waiver of Chavez's Miranda Rights

The Court finds that the Government has failed to meet its burden of proving that Chavez was aware of his rights and that he waived them prior to being questioned by Alfonsi and O'Leary. As an initial matter, the Court finds based on the evidence before it that the officers' questioning of Chavez clearly constituted a custodial interrogation. At the time he answered Alfonsi's and O'Leary's questions, Chavez was handcuffed and seated in the back of Alfonsi's patrol car and therefore was in custody.

Because Alfonsi and O'Leary subjected Chavez to custodial interrogation, the government must demonstrate that they advised Chavez of his rights in accordance with <u>Miranda</u> and that he knowingly, voluntarily, and intelligently waived those rights. The Government has not met this burden. While Alfonsi testified that she read Chavez his <u>Miranda</u> rights from a card after discovering that the handgun recovered by O'Leary had an obliterated serial number, she did not testify as to what was printed on that card. Nor is there any other evidence of the card's contents, the specific rights Alfonsi actually read to Chavez, or any other facts from which the Court could infer that Chavez validly waived his rights. (It is not clear if this card was in fact the same card referenced below regarding Detective Bien.) Thus, the government has not satisfied its burden of showing that Chavez was advised of each of the rights set forth in <u>Miranda</u> and that his waiver of those rights was knowing, voluntary, and intelligent, and Chavez's statements to Alfonsi and O'Leary made in violation of <u>Miranda</u> must be suppressed.

In reaching this conclusion the Court finds the lack of specificity or elaboration as to the content of the warnings to be significant because the government knew this was an argument that the defense would raise during the hearing. Chavez's motion identifies the explicit wording of the alleged warnings as an issue for the Court to consider. Given such notice to the government, its failure to question Alfonsi about the content of her warning presents an insurmountable obstacle to meeting its burden of establishing a valid waiver.

### 3. Bien's Miranda Warning Was Deficient

Detective Bien's Miranda warning to Chavez was legally inadequate. Bien read the

- 16 -

rights from a card issued by Metro, which reads as follows: "Advisement for Custodial Interrogation (Adults). You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to the presence of an attorney during questioning. If you cannot afford an attorney, one will be appointed before questioning. Do you understand these rights?" Importantly, Bien did not advise Chavez of "his right to consult with an attorney *before* questioning." People of Territory of Guam v. Snaer, 758 F.2d 1341, 1342 (9th Cir. 1985) (emphasis in original). It could not "easily be inferred from the warnings actually given" by Bien that Chavez had a right to consult with an attorney before speaking with the officers. United States v. Connell, 869 F.2d 1349, 1352 (9th Cir. 1989). There is no mention of consulting with or speaking to an attorney before questioning. While the warning does indicate that an attorney could be appointed before questioning, this statement occurs after the sentence saying that Chavez had a right to the "presence of an attorney during questioning." The order of these sentences suggests simply that an attorney could be appointed to be present during an interrogation and that such attorney would be appointed right before such questioning occurred. It does not suggest that Chavez could consult with an attorney prior to questioning so that Chavez could decide, after such consultation, whether to speak with officers at all. Moreover, the earlier sentence's reference to the "presence" of an attorney undercuts the notion that the attorney would be able to have an active role in consulting with or advising Chavez before or even during the questioning. The phrasing suggests the role of the attorney would be that of a neutral observer rather than an active participant whose purpose is the protection of Chavez' rights. Chavez's statement to Bien following this defective warning must therefore be suppressed.[2]

### D. Search of Chavez's Bedroom

The Court finds that the affidavit provided by Hodson was sufficient to establish probable cause for the search warrant issued by Judge Lippis even absent Hodson's misrepresentations.

---

[2] While the Court does find the warning provided by Bien to be defective for the reasons just described, the Court rejects the defense's argument that Bien's warning was defective because he did not advise Chavez that he had the right to stop questioning at any time until he talked to a lawyer. "[A] defendant need not be informed of a right to stop questioning after it has begun." United States v. Lares-Valdez, 939 F.2d 688, 689 (9th Cir. 1991).

1. Legal Standard

If the defendant, following a hearing, can establish by a preponderance of the evidence "that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit . . . and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided" and any evidence obtained through the warrant must be excluded. Franks v. Delaware, 438 U.S. 154, 155-56 (1978); see also United States v. Dozier, 844 F.2d 701, 705 (9th Cir. 1988) ("The defendant must prove by a preponderance of the evidence that there was a knowing and intentional falsehood or a reckless disregard for the truth, and that the challenged statement was essential to the finding of probable cause.").

"Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Needham, 718 F.3d 1190, 1194 (9th Cir. 2013) (internal quotation marks omitted) (quoting United States v. Grubbs, 547 U.S. 90, 95 (2006)). In the context of an affidavit presented to a judge for a determination of probable cause, "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." Illinois v. Gates, 462 U.S. 213, 239 (1983).

2. Hodson's Affidavit Was Supported By Probable Cause

The Court finds that Hodson's statement to Judge Lippis that Chavez was Rentfro's son, which went uncorrected after Hodson later discovered that it was untrue, constituted a knowing false statement. However, it did not affect the existence of probable cause for the search warrant.

The evidence shows that Hodson's representation to Judge Lippis that Chavez was Rentfro's son,[3] which Hodson did not attempt to correct after he discovered the truth, was a knowing false statement. Although Hodson did not know of the falsity of the statement at the time he made the warrant application (because he had been informed by O'Leary that Chavez

---

[3] In Hodson's affidavit, this misrepresentation was evidenced by the statements that Rentfro "identified her son as Frank Chavez," that Rentfro "stated that . . . she was in a verbal argument with her son," and that "Ms. Rentfro was staying inside the . . . room at the residence that her son rents from the homeowner." Warrant App. at 3.

was in fact Rentfro's son), Bien informed Hodson immediately after the call of the falsity of that information. Hodson and Bien's decision to nevertheless execute the warrant, without calling Judge Lippis back to ask whether this information would change her probable cause determination, converted an innocent misrepresentation into one that was knowingly false.

Nevertheless, setting this false material aside, probable cause existed to issue the search warrant for Chavez's bedroom. Even absent any information as to the relationship between Rentfro and Chavez, the Court finds that Judge Lippis had sufficient information from which to conclude that there was a "fair probability that contraband or evidence of a crime" would be found in Chavez's bedroom. Needham, 718 F.3d at 1194. Judge Lippis was informed that O'Leary had recovered a firearm from Chavez's rear pocket. She was also informed that Rentfro entered Chavez's bedroom while Alfonsi and O'Leary were outside with Chavez and that Rentfro discovered shotgun ammunition in the bedroom. Judge Lippis could also conclude that Rentfro was a credible informant due to the fact that she was known to the officers and physically present at the scene and that her previous statement that Chavez possessed a gun had been corroborated. All of these facts support a finding of probable cause as it relates to the items sought in the warrant. Based on these facts, the false statement contained in the warrant application was not essential to the finding of probable cause.

Finally, to the extent Chavez contends that Hodson made other material misrepresentations in his affidavit, the Court finds that Chavez has not established by a preponderance of the evidence that any of these statements constituted knowing or intentional falsehoods or statements made with reckless disregard for the truth, nor has he established that they were essential to the probable cause determination.

V.   **CONCLUSION**

The Court has considered the arguments and issues raised by both parties with respect to the lawfulness of the officers' entry into Chavez's residence, their patdown search of Chavez's outer clothing, the statements obtained by the officers and Detective Bien, and the search warrant obtained by Detective Hodson. For the reasons stated above,

1       IT IS ORDERED that Defendant Frank Chavez's Motion to Suppress (ECF No. 23) is
2  GRANTED IN PART and DENIED IN PART. All statements given by Chavez to Officers
3  Alfonsi and O'Leary following his placement into the police car on January 16-17, 2015 are
4  suppressed. All statements given by Chavez to Detective Bien during his custodial interrogation
5  on January 17, 2015 are suppressed. The handgun obtained from Chavez's person as a result of
6  the patdown search of Officer O'Leary on January 16, 2015 and the shotgun ammunition
7  obtained from Chavez's bedroom pursuant to the search warrant obtained by Detective Hodson
8  shall not be suppressed.

10      **DATED** this 1st day of June, 2015.

**RICHARD F. BOULWARE, II**
**United States District Judge**